*Everina Building*
# SHOPPING CENTER LEASE

THIS LEASE is made and entered into this 1st day of September 2022, by and between **Evron Inc. , as managed by"*7 Oaks Investment Corporation for Management*"** ("Landlord")

***TBD***
("Tenant")

## ARTICLE I
## FUNDAMENTAL LEASE PROVISIONS; DEFINITIONS AND EXHIBITS

1.1 **Fundamental Lease Provisions.** Each of the following subsections is individually referred to in this lease as a "Fundamental Lease Provision" and is contained in this Section 1.1 for convenience. Each reference in this Lease to a Fundamental Lease Provision shall be construed to incorporate all of the terms of such Fundamental Lease Provision. In the event of any conflict between a Fundamental Lease Provision and any other provision of this Lease, the other provision of this Lease shall govern.

(a) Landlord: **Evron Inc. , as managed by "*7 Oaks Investments*"**

(b) Landlord's Address:

(i) for Notices: 13304 West Center Road, Suite 109, Omaha, Nebraska 68144

(ii) for Rent Payments: ACH Payments

(c) Tenant: *AM314, L.L.C.*

(d) Tenant's Address for Notices: 18101 R Plaza, Suites 107, Omaha, NE ~~68144~~ 68135

(e) Tenant's Trade Name: Two Fine Irishmen

(f) Address of Premises: 18101 R Plaza, Omaha, NE ~~68144~~ 68135

(g) Approximate Number of Square Feet in Premises: 4,865 sq. ft.

(h) Lease Term: (5) Five Years & 4 months (i.e. 64 months)
Extension: (1) One Five Year Options

(i) Commencement Date: Shall be contingent upon the Tenant's approval for a Temporary Operating Permit ("TOP") from the Nebraska Liquor Commission. Should the Tenant fail to obtain the TOP due, in whole or in part, to the intentional actions of it or any of its representatives, employees, members or agents, then the parties agree that this agreement may be deemed null and void at the discretion of the Landlord, and the Tenant shall immediately pay to Landlord as liquidated damages a total amount of $28,000.00 (i.e. four months' rent at the first year's monthly rate). Regardless of intent, should the Tenant fail to obtain the TOP for any reason, the previous tenant, Irishmen 180, LLC, shall be allowed to assume this Lease in place of the Tenant.

(j) Minimum Annual Rent: Minimum rent shall begin 90 (3 months) days after the Commencement (12-1-22) date.

| | |
|---|---|
| Month 1-4 | $ 0.00/month |
| Year 1 | $7,000.00/month + NNN |
| Year 2 | $7,210.00/month + NNN |

these dates don't correspond



EXHIBIT A

| | |
|---|---|
| Year 3 | $7,426.30/month + NNN |
| Year 4 | $7,649.09/month + NNN |
| Year 5 | $7,878.56/month + NNN |

(k) Percentage Rent (if applicable): N/A

(l) Tenant Fraction: 4,865/15,916 Percentage: (30.57%)

(m) Permitted Use of Premises: Bar & Grill for dine-in and takeout.

(n) Security Deposit: $7,000.00

(o) Total Building Square Footage: 15,916

(p) Shopping Center: **Evron Inc. the Everina Building**

1.2 **Definitions.**

1.2.1 **Definition of Gross Sales.** [Intentionally Deleted]

1.2.2 **Definition of Tenant Percent.** The term "Tenant Percent" shall mean that percentage whose numerator is the total number of square feet of floor space contained in the Premises and whose denominator is the total number of square feet of leasable floor space contained in the Building, as identified in Subsection 1.1(o) above. Tenant Percent may be adjusted in the event of addition or deletion to the Shopping Center.

1.2.3 **Certain Other Definitions.** Except as otherwise expressly stated in this Lease, (i) references to this "Lease" shall include this document and any properly executed amendment thereof or supplement thereto, (ii) the phrase "Lease Year" shall mean the twelve (12) months commencing on the first day of the first full calendar month of the term of this Lease and on the succeeding anniversaries of such day, and (iii) the phrase "Fiscal Year" shall mean a period of twelve (12) consecutive full calendar months, beginning January 1 and ending December 31.

1.3 **Exhibits and Addenda.** The following Exhibits and Addenda are a part of this Lease and have been attached to this Lease prior to its execution.

Exhibit "A" - Building Site Plan
Exhibit "A-1" - Shopping Center Site Plan
Exhibit "B" - Description of Landlord's Work to be done in the Premises
Exhibit "C" - Description of Tenant's Work to be done in the Premises
Exhibit "D" - Sign Criteria
Exhibit "E" - Rules and Regulations
Exhibit "F"- Exclusive Uses
Exhibit "G"- Guaranty

**ARTICLE II**
**SHOPPING CENTER, LEASED PREMISES**

2.1 **Leased Premises.** Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the premises situated in the location shown on Exhibit "A". The address of such premises, which is referred to in this Lease as the "Premises", will be that address which is set forth as a Fundamental Lease Provision in Subsection 1.1(f). The Premises will be a part of the "Building" located in the "Shopping Center" as indicated on Exhibit "A" and as marked in the event of expansion or demolition.

2.2 **Term.** The "Term" of this Lease shall include the original term and any additional period as to which this Lease may be extended. This Lease shall be for a term consisting of the period of time set forth as a Fundamental Lease Provision in Subsection 1.1(h) plus such additional number of days as may be necessary to cause the term of this Lease to end on the last day of a calendar month, unless this Lease is sooner terminated pursuant to the provisions of this Lease. The term of this Lease shall commence on the date set forth as a Fundamental Lease Provision in Subsection 1.1 (i). Other than the parking lot pothole issue covered in Landlord's Work attached hereto as "Exhibit B," Landlord shall deliver the Premises to Tenant in its "as is" condition on or before the commencement date as set forth above. Notwithstanding any other provision of this Lease, all of Tenant's obligations under this Lease other than the payment of rent shall commence on the date on which Landlord delivers possession of the Premises to Tenant.

2.2.1 **Extensions of Term.** Provided Tenant is not in default of this Lease, Tenant may extend the term of this Lease for as many additional terms as provided in 1.1(j). Said extension(s) of term will be under the same terms and conditions as provided herein with the Minimum Rent as identified in section 1.1(j) of the Fundamental Lease Provisions. Tenant must provide Landlord written notice of its intention to extend the term as provided at least 180 days prior to expiration of the then current term. In the event that Tenant fails to timely notify Landlord of its intention to extend the term, all such extension rights shall terminate.

2.3 **Landlord's Covenants.** Landlord covenants that it is the owner of the Building and that Landlord has full power and authority to make this Lease with Tenant. Landlord further covenants that Tenant, upon the complete and timely payment of all rent and performance of all of Tenant's other obligations under this Lease, shall peacefully and quietly have, hold and enjoy the occupancy of the Premises throughout the term of this Lease or until this Lease is sooner terminated in accordance with its provisions without any disturbance from Landlord or anyone claiming by, through, or under Landlord.

2.4 **Surrender.** Upon the expiration or termination of this Lease, Tenant agrees forthwith to surrender to Landlord possession of the Premises and any fixtures and equipment (with the exception of Tenant's trade fixtures and equipment) owned by Landlord constituting part thereof with all keys thereto. At Landlord's option, any additions, improvements, or alterations made to the interior of the Premises by Tenant or Landlord shall remain a part of the Premises and be surrendered therewith upon the expiration or termination of this Lease, otherwise, upon the expiration or termination of this Lease, Tenant, at its expense, shall restore the Premises to the condition at the time of Landlord's delivery of possession thereof to Tenant.

## ARTICLE III
## RENT

3.1 **Minimum Rent.** For each Lease Year during the term of this Lease, Tenant shall pay to Landlord a guaranteed minimum annual rent in the amount set forth as a Fundamental Lease Provision in Subsection 1.1(j), such minimum annual rent being referred to in this Lease as the "Minimum Rent". The Minimum Rent shall be payable in advance in monthly installments on the first day of each calendar month during the term of this Lease as identified in Subsection 1.1(j) above. The monthly installment of Minimum Rent for any period during the term of this Lease prior to the commencement of the first Lease Year and for any other period of less than a calendar month during the term of this Lease shall be prorated on a daily basis which shall be 1/360th, and shall be paid by Tenant to Landlord within five (5) days after the end of the period for which it is due.

3.2 **Percentage Rent.** [Intentionally Deleted]

3.3 **Tenant's Records.** [Intentionally Deleted]

3.4 **Tenant's Reports.** [Intentionally Deleted]

3.5 **Audit.** [Intentionally Deleted]

3.6. **Manner and Place of Payments.** All payments of rent and any other sums payable by Tenant to Landlord under this Lease shall be made by Tenant to Landlord without demand, deduction, or set-off at the address set forth as a Fundamental Lease Provision in Subsection 1.1(b)(ii), or at such other place as Landlord from time to time may designate in writing.

3.7 **Delinquent Payments and Late Charge.** If Tenant shall fail to pay any monthly installment of minimum annual rental by the fifth (5th) day of the month for which installment is due, a late charge of ten percent (10%) of the amount owed shall be paid immediately by Tenant to Landlord as additional rent. In addition, if any rent or other sums payable by Tenant under this Lease are not paid within five (5) days after such rent or other sums are due, then such unpaid rent or other sums shall bear interest at the rate of three (3%) percent over the Prime Rate reported in the Wall Street Journal from time to time, but in no event greater than twelve percent (12%), per annum, from the due date.

## ARTICLE IV
## USE AND OPERATION OF LEASED PREMISES

4.1 **Permitted Use.** Tenant may use the Premises only for the permitted use set forth as a Fundamental Lease Provision in Subsection 1.1(m) and for no other purpose. Tenant agrees to use the Premises in such a manner as to not interfere with the rights of other tenants in the Building and Shopping Center, to comply with all applicable governmental laws, ordinances and regulations in connection with its use of the Premises, to keep the Premises in a clean sanitary condition.

4.2 **Continuous Occupancy.** Tenant agrees continuously throughout the term of this Lease to occupy the Premises and to conduct its business therefrom during all normal business hours, except when the Premises are untenantable by reason of the occurrence of any damage thereto or the destruction thereof; and Tenant's failure to comply with the preceding provisions of this sentence shall constitute a default under this Lease and shall give Landlord all of the rights and remedies set forth in Section 11.1. In the event that Tenant does not so occupy the Premises and conduct its business therefrom, then Tenant shall pay monthly as additional rent (over and above and in addition to the Minimum Rent and any other sums required to be paid by Tenant) during any such period of non-occupancy or non-conduct of its business a sum equal to the greater of (a) twenty-five percent (25%) of the Minimum Rent payable during such period or (b) one hundred twenty-five percent (125%) of the amount of Percentage Rent paid or required by the terms of this Lease to have been paid for the same period during the immediately preceding Lease Year, if applicable.

4.3 **Signs and Trade Fixtures.** Tenant shall install upon the exterior of the Premises and remove therefrom, at Tenant's expense, signs relating solely to Tenant's business in the Premises which comply with all applicable laws, ordinances, and governmental regulations and which will cause no damage to the Premises; provided, that any such signs comply with easements and covenants filed on the Property and with the sign criteria as attached hereto as Exhibit "D". Tenant shall not place or erect any signs or other devices upon any of the Common Areas. Tenant may install in the Premises and remove therefrom such trade fixtures as Tenant may deem necessary or appropriate to its business operations. Any damage to the Premises which may be caused by the removal of any of Tenant's signs or trade fixtures shall be repaired by Tenant at its expense forthwith upon the removal of any of such signs or trade fixtures.

4.4 **Employee Parking.** Tenant and its employees shall park their motor vehicles only in the areas specifically designated from time to time by Landlord for that purpose. At Landlord's request, Tenant agrees to furnish Landlord with a list of the automobile license numbers of Tenant's employees. No overnight parking allowed within Davenport Building parking lot.

4.5 **Environmental matters.**

**A. Definition.** As used in this Lease, the term "Hazardous Material" means any flammable items, explosives, radioactive materials, hazardous or substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "infectious wastes", "hazardous materials" or "toxic substances" now or subsequently regulated under any federal, state or local laws, regulations or ordinances including, without limitation, oil, petroleum-based products, paints, solvents, lead, cyanide, DDT, printing links, acids, pesticides, ammonia compounds, and including any different products and materials which are subsequently found to have adverse effects on the environment or the health and safety of persons.

B. **General Prohibition.** Tenant shall not cause or permit any Hazardous Material to be generated, produced, brought upon, used, stored, treated, discharged, released, spilled or disposed of on, in, under or about the Premises or the Shopping Center by Tenant, its affiliates, agents, employees, contractors, sublessees, assignees or invitees. Tenant shall indemnify, defend and hold Landlord and its partners, successors and assigns harmless from and against any and all actions (including, without limitation, remedial or enforcement actions of any kind, administrative or judicial proceedings, and orders or judgments arising out of or resulting therefrom), costs, claims, damages (including, without limitation, reasonable attorneys', consultants' and experts fees, court costs and amounts paid in settlement of any claims or action), fines, forfeitures or other civil, administrative or criminal penalties, injunctive or other relief (whether or not based upon personal injury, property damage, or contamination of, or adverse effects upon, the environment, water damage, or contamination of, or adverse effects upon, the environment, water tables or natural resources), liabilities or losses arising from a breach of this prohibition by Tenant, its affiliates, agents, employees, contractors, sublessees, assignees or invitees.

C. **Notice.** In the event that Hazardous Materials are discovered upon, in or under the Premises or the Shopping Center, and any governmental agency or entity having jurisdiction over the Premises or Shopping Center requires the removal of such Hazardous Materials, Tenant shall be responsible for removing those Hazardous Materials arising out of or related to the use or occupancy of the Premises or Shopping Center by Tenant or its affiliates, agents, employees, contractors, sublessees, assignees or invitees but not those of its predecessors. Notwithstanding the foregoing, Tenant shall not take any remedial action in or about the Premises or the Shopping Center without first notifying Landlord of Tenant's intention to do so and affording Landlord the opportunity to protect Landlord's interest with respect thereto. Tenant immediately shall notify Landlord in writing of: (i) any spill, release, discharge or disposal of any Hazardous Material in, on or under the Premises or Shopping Center or any portion thereof, (ii) any enforcement, cleanup, removal or other governmental or regulatory action instituted, contemplated, or threatened (if Tenant has notice thereof) pursuant to any Hazardous Materials Laws or regulations, (iii) any claim made relating to damage or contribution, against Tenant, the Premises or the Shopping Center relating to damage, contribution, cost recovery, compensation, loss or injury resulting from or claimed or result from any Hazardous Materials; and (iv) any reports made to any governmental agency or in, on, under or about or removed from the Premises or Shopping Center, including any complaints, notices, warnings, reports or asserted violations in connection therewith. Tenant also shall supply to Landlord as promptly as possible, and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating in any way to the Premises or Shopping Center or Tenant's use or occupancy thereof.

4.6 **Government Regulations**. Landlord shall use good faith efforts to comply with all laws and regulations of any municipal, state, or federal authorities, including all requirements of the Americans with Disabilities Act of 1990 (hereinafter collectively referred to as "Laws"), as the same relate to the Common Areas, and those portions of the Building and/or Shopping Center under Landlord's primary control. Tenant shall comply with all said Laws as they relate to Tenant's use of the Premises. Should Tenant subsequently elect to undertake any alterations, additions or construction within the Premises, Tenant shall be solely responsible for, and Tenant shall hold Landlord harmless from, any liability as a result of any non-compliance with said Laws in connection with Tenant's work; further, Landlord's approval of any of Tenant's plans or specifications shall not relieve Tenant of any such responsibility, or cause Landlord to incur any liability.

## ARTICLE V
## MAINTENANCE, REPAIRS AND ALTERATIONS OF THE LEASED PREMISES

5.1 **Maintenance and Repairs.** Except as otherwise provided in this Lease, Landlord, at its expense, shall keep and maintain the foundation, roof, and structural walls (excluding painting, which shall be part of the Common Area Maintenance) of the Premises only, in good condition and repair at all times during the term of this Lease, except for damage thereto caused by the acts or omissions of Tenant or any of Tenant's contractors, employees, agents, customers, or invitees. Tenant shall be responsible for and shall, at its expense, repair any damage to the roof of the Premises resulting from any penetration of the roof of the Premises made by Tenant or its agents or contractors for the purpose of installing vents, exhaust fans, or similar devices serving the Premises, or for any other purpose. Tenant, at its expense, shall repair any damage to any portion of the Premises caused by the acts or omissions of Tenant or any of Tenant's contractors, employees, agents or invitees. Except for those items for which Landlord is responsible pursuant to the first sentence of this Section, Tenant, at its expense, shall keep and maintain the Premises in good, safe, and sanitary condition and repair at all times during the term of this Lease in such manner as Landlord and any insurer of

the Premises reasonably may require and also as may be required to comply with all applicable laws; ordinances; easements, covenants, conditions or restrictions now of record or recorded by Landlord upon the Premises in the future; and rules and regulations of any federal, state, or local government agency or subdivision having jurisdiction over the Premises. Tenant's responsibilities under this Section shall include, but are not limited to, all plate glass windows, locks and doors in the Premises and the fixtures and equipment serving or constituting a part of the Premises (including, but not limited to, the lighting, heating, air conditioning, ventilating, plumbing, electrical and sewer and other mechanical systems and equipment serving the Premises). Tenant, at its expense, promptly shall make any and all repairs and replacements to the Premises and to the fixtures and equipment serving or constituting a part thereof which may be required to comply with the obligations of Tenant under this Section, in each case in a good and workmanlike manner using materials, fixtures, and equipment whose quality is at least equal to that of the materials, fixtures, and equipment being repaired or replaced. Upon the expiration or termination of this Lease, Tenant shall deliver the Premises and the fixtures and equipment constituting a part thereof (excluding Tenant's trade fixtures and equipment) to Landlord in good condition and repair, reasonable wear and tear excepted. Notwithstanding the foregoing provisions of this Section, Landlord and Tenant agree that this Section shall be applicable to any damage to, or destruction of, the Premises falling within the scope of Section 9.1 or Section 13.1, which damage or destruction shall be governed by the provisions of such other Sections.

5.2 **Liens.** Tenant shall have no authority to cause or permit a mechanic's, construction, or other lien to arise or be perfected with respect to the Premises, or any part thereof; and Tenant shall so advise any contractor performing any work or providing any materials for Tenant in or with respect to the Premises. If any mechanic's , construction, or other lien is filed against the Premises, or any part thereof, for any reason whatsoever by reason of Tenant's acts or omissions or because of a claim against Tenant, then Tenant shall cause such lien to be canceled and discharged of record by bond or otherwise within ten (10) days after written request by Landlord.

5.3 **Alterations by Tenant.** Tenant, at its expense, during the term of this Lease may make such non-structural alterations to the interior of the Premises as it deems appropriate; provided, that (i) the structural integrity of the Premises is not thereby adversely affected or diminished, (ii) the roof of the Premises is not affected, (iii) the value of the building in which the Premises are located is not thereby diminished, (iv) the exterior appearance (including the store front) of the Premises is not thereby altered or changed, and (v) the cost of any alteration does not exceed S2,500.00. In all other instances Tenant shall secure the prior written approval of the Landlord before making any alterations. In all cases Tenant must obtain Landlord's written consent before making any roof penetrations for the purpose of installing vents, exhaust fans, or similar devices to serve the Premises or for any other purpose. All such alterations shall be completed in a good and workmanlike manner with first-class materials and workmanship.

5.3.1 **Landlord's Contribution.** Landlord will provide new AC unit and ductwork.

5.3.2 **Tenants Work.** Tenants contractor shall provide all the alterations and improvements to the Premises identified in Exhibit "C" attached hereto.

## ARTICLE VI
## UTILITIES

6.1 **Utilities.** Tenant shall pay for all gas, water, electricity, telephone, and other utility services used or consumed in or about or furnished to the Premises during the term of this Lease and shall pay all sewer use fees or similar charges made or imposed with respect to or against the Premises during the term of this Lease. Tenant shall hold Landlord and the Premises harmless from all liens, charges, and costs with respect to such items. Tenant agrees that it will not install any equipment which will exceed or overload the capacity of any utility facilities serving the Premises and that if any equipment installed by Tenant requires additional utility facilities; such additional utility facilities shall be installed at Tenant's expense in accordance with plans and specifications approved in writing in advance by Landlord. Landlord shall not be liable for any interruption in the supply of any utilities, and Landlord does not guarantee the availability of any utilities. Tenant's payments for utility services shall be made directly to the utility or other provider of such service.

## ARTICLE VII
## OPERATION AND COST OF MAINTENANCE OF COMMON AREAS

7.1 **Definition of Common Areas.** The term "Common Areas" shall mean all areas within the exterior boundaries and ingress and egress roadways of the Shopping Center which are now or hereafter may be available for

the joint and common use and benefit of Landlord, occupants of the Building and Shopping Center and their employees, agents, servants and other invitees including, without limitation; any pedestrian malls, customer and employee parking areas; streets; access roads; driveways; fences; water, sanitary and storm sewer, gas, electric, telephone and other utility lines, systems, conduits, and facilities to the perimeter walls of any building; landscaped areas; loading areas; sidewalks; any Shopping Center pylon or monument sign; and the facilities appurtenant to each and all of the foregoing.

7.2 **Operating Costs.** Tenant shall pay to Landlord as additional rent in the manner provided in Section 7.5, the Tenant Fraction, as defined in Section 1.2.2, of all costs and expenses of every kind and nature during the Lease Term (including appropriate reserves) in operating, managing, equipping, policing and protecting, lighting, repairing, replacing, resurfacing, restriping and maintaining the Common Areas. Such costs and expenses shall include, but not be limited to, cleaning, trash removal (including providing dumpsters for tenants use), fire protection, snow and ice removal, landscaping, planting and replanting, water and sewer charges, premiums for liability, property damage, fire and workmen's compensation insurance, wages, unemployment taxes, social security taxes, personal property taxes, real estate taxes and assessments or fees for required licenses and permits, supplies, maintenance and repair of the sprinkler system or any part thereof (whether performed in the Common Areas, the Premises, Building or any other site within the Shopping Center), repair of sidewalks and curbs, installation and repair of Building identification signs, rental charges, depreciation of equipment and machinery employed directly or indirectly in the operation of the common area, capital expenditures required by any governmental authority whether or not applicable to the Building or Common Area at the time the Shopping Center was initially constructed, management fees paid to a property manager, and an administrative charge equal to fifteen percent (15%) of the cost and expense of operating and maintaining the Common Areas. The administrative charge shall not be applicable to Real Estate Taxes as per Section 8.1, reserves as provided in this paragraph, insurance as per Section 8.2, management fees paid to a property manager, or depreciation.

7.3 **Operation by Landlord.** Notwithstanding anything set out in this Lease to the contrary, it is agreed that (i) all Common Areas shall be subject to the exclusive control and management of Landlord, and Landlord shall have the right at any time, once or more often, to change the size, area, level, location and arrangement of the access roads, parking areas, and other Common Areas thereon and therein and to permit the owners or occupants of land located outside the Building and Shopping Center and their invitees to use the Common Areas, (ii) Landlord shall have the right to temporarily close all or any portion of said parking areas and other common facilities in order to make repairs, changes and additions thereto.

7.4 **Common Areas Contribution.** In each Fiscal Year Tenant shall pay to Landlord Tenant's Fraction of the "Operating Costs" (as defined in Subsection 7.2) as per the terms of paragraph 7.5 below.

7.5 **Payment.** The Common Areas Contribution payable by Tenant under this Article shall be paid in monthly installments on the first day of each calendar month in advance, in an amount reasonably estimated by Landlord. Within sixty (60) days after the end of each Fiscal year, Landlord shall furnish Tenant with a statement summarizing the actual Operating Costs for the preceding Fiscal Year and setting forth the method by which Tenant's Common Areas Contribution was determined as herein provided. To the extent the aggregate of the monthly Common Areas Contributions paid by Tenant during such Fiscal Year exceeds the amount which was paid by Tenant during such Fiscal Year, as provided in Section 7.5, the difference shall be credited against the next succeeding monthly Common Areas Contribution to be made by Tenant under this Article, except during the last Lease Year of the term, Landlord will refund such excess to Tenant within thirty (30) days following the expiration of the term, provided Tenant has discharged all of its obligations under this Lease. If the aggregate of the monthly Common Areas Contribution paid by Tenant during any Fiscal Year is less than the actual amount due, Tenant shall pay Landlord the difference between the amount paid by Tenant and the actual amount due, within thirty (30) days of demand therefor by Landlord. Any claim by Tenant for revision of any statement submitted by Landlord hereunder for any such Fiscal Year, which claim is not made within thirty (30) days after receipt of such statement, shall be deemed waived and discharged. For the Fiscal Year in which this Lease commences or terminates, Tenant's Common Areas Contribution shall be prorated, if applicable, on the basis of a 360 day year.

## ARTICLE VIII
## TAXES, INSURANCE AND INDEMNIFICATION

8.1 **Taxes.** Landlord agrees to pay, prior to delinquency, the general real estate taxes and installments of special taxes, assessments, or levies of any kind (however denominated) payable during the term of this Lease (collectively

referred to in this Article as the "Taxes") on the land and improvements constituting the Shopping Center; provided, that Tenant shall pay to Landlord for each Lease Year, as additional rent, Tenant's Tax Contribution (as defined in the following sentence). For purposes of this Lease, Tenant's "Tax Contribution" for a Lease Year shall be the Tenant Fraction, as that term is defined in Section 1.2.2, of the Taxes actually paid by Landlord during such Lease Year, regardless of the tax period to which such Taxes relate; provided, that not more than twelve (12) months' Taxes shall be taken into account by Landlord for purposes of determining Tenant's Tax Contribution for any Lease Year; and provided further, that if Landlord pays more than twelve (12) months' Taxes during any Lease Year, then the Taxes for the period in excess of twelve (12) months (to the extent not previously taken into account for purposes of this Article) shall be carried forward to the next Lease Year or Lease Years and shall be taken into account by Landlord for purposes of computing Tenant's Tax Contribution for such next Lease Year or Lease Years. If any portion of the Shopping Center is assessed for real estate tax purposes as a separate parcel and the Taxes on such separate parcel are payable by a tenant or owner other than Landlord, then such Taxes shall not be included in the Taxes for purposes of Tenant's Tax Contribution under this Article; and in such event the denominator of the Tenant Fraction for purposes of this Article shall be reduced by the number of square feet of leasable floor space contained in the building or buildings located on such separate parcel. Tenant shall pay to Landlord, concurrently with Tenant's payments of the monthly installments of Minimum Rent, an amount equal to one-twelfth (1/12) of Tenant's estimated Tax Contribution for the current Lease Year, as determined annually and communicated to Tenant in writing by Landlord; within thirty (30) days after the end of each Lease Year, Tenant shall pay to Landlord any unpaid portion of its actual Tax Contribution for such Lease Year or shall be entitled to a credit from Landlord for any excess Tax Contribution actually paid by Tenant for such Lease Year. Tenant's Tax Contribution for the final Lease Year shall be prorated if such final Lease Year contains less than twelve (12) full months. Tenant agrees to pay when due all property taxes of any kind which during the term of this Lease may be assessed against any personal property, fixtures, or leasehold improvements of Tenant at any time located in or about the Premises.

8.2 **Public Liability & Casualty Insurance.** Tenant shall pay as additional rent its Tenant's Fraction of the general liability insurance and all risk property damage insurance carried by Landlord for the Premises and Building. Payment shall be made in the same manner as set forth in Paragraph 7.5 for Common Areas Contribution. Tenant will not use or occupy the Premises in a manner which would invalidate or cause an increase in the cost of such insurance.

Tenant, at its expense, at all times during the term of this Lease and any other period of occupancy of the Premises by Tenant shall obtain and keep in force with respect to the Premises comprehensive public liability insurance in form customarily written for the protection of owners, landlords, and tenants of real estate, with Landlord and Tenant as named insureds, which insurance shall provide coverage of not less than $2,000,000.00 for each occurrence of bodily injury, death or property damage. The policies for all such insurance shall provide that they may not be canceled without at least thirty (30) days' prior written notice to Landlord. Tenant shall furnish to Landlord appropriate certificates evidencing that such insurance is in force. All policies of insurance provided herein shall be issued by insurance companies approved by Landlord.

Tenant agrees, at its expense, during the term of this Lease and any other period of occupancy of the Premises by Tenant to obtain and keep in force with respect to Tenant's leasehold improvements, inventory, fixtures and equipment, signs and other personal property in the Premises replacement value fire and broad from extended coverage insurance on at least eighty percent (80%) co-insurance basis; Landlord shall be included as a named insured under the policies providing such insurance with respect to Tenant's leasehold improvements, and Tenant shall furnish Landlord with an appropriate certificate evidencing that all such insurance is in force and that Landlord is a named insured thereunder as to such leasehold improvements; and such policies shall provide that they may not be canceled without at least thirty (30) days prior written notice to Landlord. All policies of insurance provided herein shall be issued by insurance companies approved by Landlord.

8.3 **Waiver of Claims.** Each party hereto hereby waives any and all claims for or right of recovery which such party or anyone claiming through such party may have against the other party hereto (or such other party's officers, agents, or employees) for, or with respect to, any loss of or damage to such waiving party's property or for any business interruption which is insured or indemnified under valid insurance policies, whether or not such loss, damage, or business interruption is caused by the negligence of such other party or such other party's officers, agents, employees, or any other person or persons for whose actions such other party may be responsible or liable; provided, that the foregoing waiver shall be effective only to the extent of the insurance proceeds actually collected under such policies in respect of such loss, damage, or business interruption and only when permitted by the applicable insurance policy.

Such waiver of claims by Tenant also shall operate as a similar waiver in favor of the other tenants of the Shopping Center and the respective officers, agents and employees or such other tenants.

8.4 **Indemnification.** Tenant agrees to indemnify Landlord against, and to hold Landlord harmless from, any and all claims or demands of any third party arising from, or based upon, any act, omission, or negligence of Tenant or Tenant's contractors, agents, invitees, customers, employees, or anyone else for whom Tenant may be responsible. In the event that Landlord shall, without fault on its part, be made a party to any litigation commenced by any third party against Tenant, then Tenant shall hold Landlord harmless from such litigation and shall pay all costs, expenses, and reasonable attorneys' fees incurred or paid by Landlord in connection with such litigation, together with any judgments rendered against Landlord.

## ARTICLE IX
## DAMAGE OR DESTRUCTION

9.1 **Damage or Destruction.** If the Premises shall be partially or wholly damaged or destroyed by fire or any other casualty except Tenant's negligent or intentional acts, then Landlord forthwith shall proceed to repair and restore the Premises to at least the condition the Premises were in immediately prior to such damage or destruction; provided, that Landlord's work shall not include the repair or restoration of any improvements installed or other work done by Tenant in or about the Premises. If the Building is more than thirty three and one-third percent (33 1/3%) damaged or destroyed by fire or any other casualty covered by such insurance, then Landlord shall have the option either to cancel this Lease by notice to Tenant in writing within sixty (60) days after the occurrence of such damage or destruction or to repair and restore the Building to at least the condition it was in immediately prior to such damage or destruction, in which latter event this Lease shall continue in full force and effect; provided, that Landlord's work shall not include the repair or restoration of any improvements installed or other work done by Tenant in or about the Premises. If Landlord repairs or restores the Premises or the Building, as the case may be, pursuant to this Section, then Tenant at its expense promptly shall repair, restore or replace all of its leasehold improvements, trade fixtures, and personal property damaged or destroyed by such fire or other casualty. In the event of termination, all proceeds from Tenant's fire and extended coverage insurance under Section 8.2 covering Tenant's Leasehold Improvements, but excluding proceeds for trade fixtures, merchandise, signs and other removable personal property, shall be disbursed and paid to Landlord.

9.2 **Abatement of Rent.** In the event of any damage to, or destruction of, the Premises which makes the Premises in whole or in part unfit for use by Tenant in the normal course of its business in the Premises, then the Minimum Rent, or a proportionate part thereof based upon that portion of the Premises which is unfit for use by Tenant in the normal course of its business, shall abate until the Premises have been repaired or restored by Landlord. Nothing in this Section shall be construed to abate the Percentage Rent, if applicable or any additional rent payable by Tenant under this Lease but the computation of the Percentage Rent shall be based upon the reduced Minimum Rent to the extent that the Minimum Rent is abated pursuant to the preceding sentence.

## ARTICLE X
## ASSIGNMENT AND SUBLETTING

10.1 **Assignment and Subletting.** Tenant shall have no right to assign this Lease or to sublet the Premises without the prior written consent of Landlord; provided, that if Landlord in its absolute discretion gives such consent, then Tenant shall remain primarily liable to Landlord for the payment of the rent and the performance of all of Tenant's other obligations under this Lease for the remainder of the term of this Lease. Tenant shall not allow, or permit any transfer of this Lease, or of any interest in or rights under this Lease, by operation of law and shall not mortgage, pledge, or encumber this Lease, or any interest herein.

## ARTICLE XI
## DEFAULT, BANKRUPTCY, SECURITY INTEREST, AND SECURITY DEPOSIT

11.1 **Default.** If Tenant defaults in the payment of any rent, additional rent, percentage rent, if applicable, or other sums due and payable by Tenant to Landlord under this Lease for a period of more than five (5) days after the particular payment was due, or if Tenant violates or defaults in the performance of any covenant, agreement, or other condition contained in this Lease (other than the payment of rent or other sums payable under this Lease) for a period of more than thirty (30) days after written notice of such violation or default has been given by Landlord to Tenant (or, in the case of a default not curable within thirty (30) days, if Tenant shall fail to commence to cure such default within such

thirty (30) days and thereafter proceeds diligently to complete the cure thereof, provided that such period to cure shall in no event exceed ninety (90) days), then Landlord, at its option, may re-enter and repossess the Premises, with or without process of law, and, at its option, may declare this Lease terminated and the term of this Lease ended forthwith; and Landlord shall not be liable for damages by reason of such re-entry and repossession. Notwithstanding such re-entry and repossession by Landlord and whether or not Landlord exercises its option to terminate this Lease, the liability of Tenant for the payment of the rent and other sums due or to become due under this Lease and for the performance of Tenant's other obligations under this Lease for the remainder of the term of this Lease (determined as if Landlord had not terminated this Lease) shall not be relinquished or extinguished but shall continue in full force and effect; and Landlord at any time may commence such one or more actions as it may deem necessary to collect any sums due from or payable by Tenant under this Lease for such period. In the event of any such re-entry and repossession, Landlord shall have the right to relent all or any portion of the Premises upon such terms and conditions as Landlord may deem appropriate; and any such reletting shall not relieve Tenant of any of its obligations to Landlord under this Lease, except to the extent of any net rentals actually received by Landlord from such reletting after deducting all of Landlord's expenses (including, but not limited to, legal expenses, brokerage commissions, and the costs of remodeling the Premises so as to render the Premises suitable for reletting) incurred in preparing for and accomplishing such reletting. Tenant further agrees to pay, in addition to the rent and other sums payable under this Lease, such additional sums as a court of competent jurisdiction may adjudge reasonable as attorneys' fees in any suit or action instituted by Landlord to enforce the provisions of this Lease or the collection of the rent or other sums payable by Tenant under this Lease. Tenant hereby waives any right of redemption which it may have under any present or future law in the event Tenant is evicted from or dispossessed of the Premises for any reason. Unless Landlord otherwise agrees in writing, Tenant's surrender of possession of the Premises to Landlord prior to the end of the term of this Lease and Landlord's acceptance of such surrender shall not effect a termination of this Lease or release Tenant from any of its obligations under this Lease for the remainder of the term of this Lease.

11.2 **Bankruptcy.** In the event Tenant becomes the subject of voluntary or involuntary proceedings under the federal bankruptcy statutes as in effect from time to time, Landlord shall have all of the rights and remedies which are available to a landlord under such statutes in such an event. Such event also shall constitute a default under this Lease, and Landlord thereupon may exercise all of its rights and remedies under Section 11.1 unless prohibited from doing so by such statutes.

11.3 **Security Deposit.** Tenant shall deposit with Landlord as a security deposit under this Lease the amount set forth as a Fundamental Lease Provision in Subsection 1.1(n). Such security deposit shall be held by Landlord, without interest, as security for the faithful performance by Tenant of all the terms of this Lease to be observed and performed by Tenant.

11.4 **Waivers.** One or more waivers by Landlord or Tenant of a breach of any covenant or condition by the other of them shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval by Landlord or Tenant to or of any act by either requiring the other's consent or approval shall not be deemed to waive or render unnecessary either party's consent to, or approval of, any subsequent similar act by the other party. No waiver or consent of either party shall be binding unless in writing, and Landlord's acceptance of rent with knowledge of the existence of any breach of this Lease by Tenant shall not constitute a waiver of such breach.

11.5 **Cumulative Rights.** The rights, options, elections and remedies of Landlord and Tenant contained in this Lease shall be cumulative and may be exercised on one or more occasions; and none of them shall be construed as excluding any other or additional right, priority or remedy allowed or provided by law.

## ARTICLE XII
## ENTRY BY LANDLORD

12.1 **Entry by Landlord.** Landlord shall have the right to enter upon the Premises at all reasonable hours for the purpose of inspecting the Premises, for the purpose of making repairs, additions or alterations thereto, or for any other lawful purpose; provided, such entry shall not unreasonably interfere with the conduct of Tenant's business. For a period commencing six (6) months prior to the expiration of this Lease, Landlord may have reasonable access to the Premises for the purpose of exhibiting the Premises to prospective tenants thereof and may display "For Rent" signs on the Premises.

## ARTICLE XIII
## EMINENT DOMAIN

13.1 **Eminent Domain.** If the whole of the Premises or the Building or the parking area for the Building shall be taken under the power of eminent domain, then this Lease shall terminate and expire as of the date upon which the title vests in the public authority involved; the rent and any other sums payable under this Lease shall be prorated as of such date, and Landlord shall be released from any further liability under this Lease. If more than twenty-five (25%) percent, but less than all of the floor area of the Premises or of the Building shall be taken or condemned, or if the ratio of square feet of parking area in the Building to the square feet of all leasable floor space in the buildings then located in the Building is reduced to less than 3 1/2 to 1 through condemnation or eminent domain proceedings, then either Landlord or Tenant may terminate this Lease by serving upon the other party a written notice of termination effective as of the date upon which possession must be surrendered to the public authority involved. In the event that such option to terminate is exercised, the Minimum Rent and any other sums payable under this Lease shall be prorated as of such date of surrendered possession, and Landlord and Tenant shall be released from any further liability under this Lease. Landlord shall be entitled to the entire award or compensation in such proceedings, whether such damages shall be awarded as compensation for diminution in value of the leasehold or for the fee of the premises. The rental and other charges for the lease month on the Tenant's occupancy shall be prorated. Nothing herein shall be construed to preclude Tenant's rights to receive compensation or damages for the unamortized cost depreciated on a straight-line basis over the original term of this Lease of fixtures and removable personal property; provided, however, that no such claims shall diminish Landlord's award or the award of Landlord's mortgage. For the purposes of this Paragraph 13.1, a voluntary sale or conveyance in lieu of condemnation, but under the threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain.

## ARTICLE XIV
## SUBORDINATION OF LEASE; ESTOPPEL CERTIFICATES

14.1 **Subordination of Lease.** Landlord reserves the right to place liens and encumbrances on the Premises superior in lien and effect to this Lease. This Lease, and all rights of Tenant hereunder, shall, at the option of Landlord, be subject and subordinate to any liens and encumbrances now or hereafter imposed by Landlord upon the Premises or the Building or any part thereof, and Tenant agrees to execute, acknowledge, and deliver to Landlord, upon request, any and all instruments that may be necessary or proper to subordinate this Lease and all rights herein to any such lien or encumbrance as may be required by Landlord.

In the event any proceedings are brought for the foreclosure of any mortgage on the Premises, Tenant will attorn to the purchaser at the foreclosure sale and recognize such purchaser as the Landlord under this Lease. The purchaser, by virtue of such foreclosure, shall be deemed to have assumed, as substitute Landlord, the terms and conditions of this Lease until the resale or other disposition of its interest. Such assumption, however, shall not be deemed an acknowledgment by the purchaser of the validity of any then existing claims of Tenant against the prior Landlord. Tenant agrees to execute and deliver such further assurances and other documents, including a new lease upon the same terms and conditions contained herein, confirming the foregoing, as such purchaser may reasonably request. Tenant waives any right of election to terminate this Lease because of any such foreclosure proceedings.

14.2 **Estoppel Certificates.** Tenant, from time to time upon written request from Landlord, agrees to execute, acknowledge and deliver to Landlord, in form reasonably satisfactory to Landlord, a written statement certifying that Tenant has accepted the Premises, that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, setting forth the modifications), that the Landlord has performed all of its obligations under this Lease and is not in default under this Lease, the date to which the rent and other sums payable by Tenant under this Lease have been paid in advance (if any), the commencement and termination dates of the term of this Lease, and such additional facts as reasonably may be required by Landlord. Tenant understands and agrees that any such statement delivered pursuant to this Section may be relied upon by a prospective purchaser of the Premises, any mortgagee or prospective mortgagee of the Premises and their respective successors and assigns.

## ARTICLE XV
## PROMOTION AND ADVERTISING

15.1 **Promotion and Advertising.** Landlord may establish a "Promotion Fund" for the Shopping Center, the object of which shall be the general promotion and furtherance of the business interests of tenants in the Shopping Center, by any other form of advertising or promotional programs which Landlord in its sole discretion establishes. Tenant agrees to pay to Landlord each year, beginning on the later of the Commencement Date, or the date the fund

is created, an amount equal to fifty cents ($.50) per square foot of the Premises (prorated for any partial year). One-twelfth (1/12) of such amount shall be payable in advance on the first day of each month, as Tenant's contributions toward the Promotion Fund.

Landlord shall contribute to the Promotion Fund an amount equal to twenty-five percent (25%) of the Promotion Fund contributions collected from all tenants in the Shopping Center during each calendar year. Any overpayment or underpayment of such amount by Landlord shall be adjusted annually. The Tenant's contribution shall be increased after each three year period during the term of this Lease based upon the increase of the Consumer Price Index (as defined herein) since the first month of the preceding three year period. The term "Consumer Price Index" as used in this Article XV shall mean "United States City Average All Items for All Urban Consumers (CPI-U), 1982-84=100) published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the publication of the Consumer Price Index is discontinued, comparable statistics on the purchasing power of the consumer dollar published by a reasonable financial periodical selected by Landlord shall be used for making such computations.

Landlord shall utilize said promotion charges for all costs associated with any form of advertising or promotional program which Landlord in its sole discretion establishes.

Tenant shall use its best efforts to use the Shopping Center name as set forth in Section 1.1(p) in all of its advertising and promotion.

## ARTICLE XVI
## EXCLUSIVE COVENANTS AND EASEMENTS

16.1 **Exclusive Covenants and Easements.** Notwithstanding anything to the contrary contained herein, this Lease is subject to and made on the understanding that Landlord has or will grant certain exclusive use rights to other tenants, owners, or occupants of the Shopping Center (herein the "Exclusive Covenants") pursuant to other Leases in the Shopping Center. Tenant, shall not use the Premises for any reason for the uses listed in Exhibit "F".

Tenant acknowledges that Tenant's use and/or occupancy of the Premises in violation of any current or future Exclusive Covenants would subject Landlord to substantial damages and Tenant agrees that any violation by Tenant of any Exclusive Covenants shall constitute a default hereunder entitling Landlord to immediately upon delivery of notice to Tenant to terminate with thirty (30) days advanced written notice to Tenant this Lease, or to obtain relief from a court of competent jurisdiction enjoining Tenant from violating such Exclusive Covenants or to exercise any of the remedies stated herein and any other remedies available under the law of the state where the Premises are located.

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS

17.1 **Holdover.** In the event that Tenant remains in possession of the Premises after the expiration or termination of this Lease, then Tenant shall be deemed to be occupying the Premises as a Tenant from month to month, subject to all of the conditions, provisions and obligations of this lease, but without any rights to extend the term of this Lease; provided, that the Minimum Rent payable by Tenant during any such period of holdover shall be computed at the rate of one hundred twenty-five (125%) percent of the Minimum Rent payable by Tenant during the Lease Year most recently ended. Landlord's acceptance of rent from Tenant in such event shall not alter the status of Tenant as a month-to-month tenant whose occupancy of the Premises may be terminated by Landlord at any time upon month's notice in advance.

17.2 **Notices.** Any notice to be given hereunder shall be given in writing and be sent by registered or certified mail, or hand delivered, or sent by reputable overnight carrier to the address set forth as a Fundamental Lease Provision in Subsection 1.1(b)(i) or (d). Either party may by written notice to the other party change the address at which it wishes to receive any notice given under this Lease.

17.3 **Relationship of Parties.** Nothing contained in this Lease shall be deemed or construed by Landlord or Tenant, or by any third party, to create the relationship of principal and agent's partnership or joint venture between Landlord and Tenant or any relationship other than Landlord and Tenant.

17.4 **Time of Essence.** Time is of the essence of this Lease, and all provisions of this Lease relating to the time or performance of any obligation under this Lease shall be strictly construed.

17.5 **Brokers.** Tenant warrants that it had no dealings with any broker or agent in connection with the negotiation or execution of this Lease.

17.6 **Severability.** If any provision of this Lease shall be declared legally invalid or unenforceable, then the remaining provisions of this Lease nevertheless shall continue in full force and effect and shall be enforceable to the fullest extent permitted by law.

17.7 **Number and Gender.** Where the context of this Lease requires, singular words shall be read as if plural, plural words shall be read as if singular, and words of neuter gender shall be read as if masculine or feminine.

17.8 **Captions and Interpretations.** The captions, section numbers, article numbers and table of contents appearing in this Lease in no way define, limit, construe or describe the scope or intent of such sections or articles of this Lease. The language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning, and not strictly for nor against either Landlord or Tenant, and should a court be called to interpret any provision hereof, no weight shall be given to, nor shall any construction or interpretation be influenced by, any presumption of preparation of a Lease by Landlord or by Tenant.

17.9 **Multiple Counterparts.** This Lease may be executed in multiple counterparts, each of which shall be deemed to be an original for all purposes.

17.10 **Governing Law.** This Lease shall be governed by and construed in accordance with the laws of the State of Nebraska.

17.11 **Binding Agreement.** All rights and liabilities given to, or imposed upon, Landlord or Tenant in this Lease shall extend to, and bind, their respective heirs, executors, administrators, personal representatives, successors and

assigns. No rights, however, shall inure to the benefit of any assigns of Tenant, unless the assignment thereof to such assignee has been approved in writing by Landlord.

17.12 **Entire Agreement.** Landlord and Tenant hereby agree that this document contains the entire agreement between them and that there are no other agreements, written or verbal, between them pertaining to the Premises or the subject matter hereof. This Lease may not be amended or supplemented orally, but only by an agreement in writing which has been signed by the party against whom enforcement of any such amendment or supplement is sought.

17.13 **Attorney's Fees.** In the event that at any time during the term of this Lease, either Landlord or Tenant shall institute any action, proceeding, or appeal against the other relating to the provisions of this Lease, or incur any attorney's fees in connection with any default hereunder, then the unsuccessful party in such action or proceeding shall reimburse the successful party for the reasonable expenses of attorney's fees and expenses incurred therein by the successful party.

17.14 **Sale by Landlord.** In the event of any sale or exchange of the premises by Landlord or assignment by Landlord of this Lease, the selling, exchanging or assigning Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission relating to the Premises or this Lease that occurs after the consummation of such sale, exchange or assignment; provided such purchaser or assignee shall expressly assume said covenants and obligations of Landlord.

17.15 **Rules and Regulations.** Landlord and Tenant agree to be governed by Rules and Regulations attached as Exhibit "E" that the Landlord shall from time to time modify and amend and such Rules and Regulations are expressly made a part of this Lease.

17.16 **Confidentiality**. The parties acknowledge that the terms and conditions set forth in this Lease are confidential in nature, and that the negotiations preceding the drafting of this instrument are private as between Landlord and Tenant. Therefore, neither party nor their agents (including their respective brokers and attorneys) shall disclose any of the terms or conditions herein contained to any person other than authorized agents.

**LANDLORD:**

"Seven Oaks Investment Corporation for management", Authorized Agent for **Evron, Inc. ,** a Nebraska Company

BY: Nancy Waggener
Nancy Waggener

TITLE: President

**TENANT:**
**AM314, L.L.C.**

BY: Matt Longcor
Matt Longcor

TITLE: Owner/Member

EXHIBIT "A"

BUILDING SITE PLAN

EXHIBIT "A-1"

SHOPPING CENTER SITE PLAN

**EXHIBIT "B"**

**LANDLORD'S WORK**

Fixing parking lot concrete potholes and painting of dining patio fence. The parties acknowledge this work has been completed.

EXHIBIT "C"

TENANT'S WORK

# EXHIBIT "D"
# SIGN CRITERIA

The purpose of the sign criteria is to establish standards and guidelines for design, fabrication and installation of tenant signage at the Shopping Center. Landlord, in landlord's sole judgement, reserves the right for final approval of any sign, banner, temporary signage, awning, or facade requested to be installed by Tenant.

**GENERAL REQUIREMENTS:**

1. Tenant will be responsible for all design and installation of all signage at its sole cost and expense.

2. Tenant will submit to Landlord color copies of fabrication drawings for Landlord's review and approval. These drawings must show the proposed sign in elevation on the full extent of the Tenant's store front leased area and a full specification drawing is necessary to describe the method of assembly and electrical components used.

3. All permits and approvals as required by local building or sign codes shall be obtained and paid for by the Tenant at its sole cost.

4. Signs must be illuminated signs and shall be wired back to the Tenant's electrical panel. Signs must be individual mounted letters, shapes without a sign background or sign boxes, as applicable.

5. The following are prohibited, without previous written approval of Landlord:

    a. Flashing or blinking sign.
    b. Exposed electrical boxes, conduit, raceways, or transformers.
    c. Descriptions of services, products or merchandise other than the Tenant's trade name.
    d. Banners, flags or pennants.
    e. Trailer signs or box type signs and marquee type signs.
    f. Projecting signs, roof signs or animated or audible devices,
    g. No paper, cloth, cardboard, decal or similar signs shall be applied to any store front or window.
    h. Bandit or other portable signs.

6. Tenant shall maintain all signs in good appearance and illumination and shall be responsible for penetrations, leaks or damage caused by the sign to Landlord's property. If Tenant fails to comply with this provision within ten (10) days after written notice from Landlord, Landlord reserves the right but not the obligation to perform such repairs or alterations required by Tenant; and, in the event Landlord exercises such right, Tenant shall reimburse Landlord for all of Landlord's costs within five (5) days after receipt of Landlord's invoice.

7. All illumination signs must bear the UL label and the installation must comply with the building and electrical codes.

8. Tenant shall install on the store front the numbers only for the street address of the premises. Size, type and color of the numbers shall be in conformance with other tenant spaces and as approved by Landlord.

9. The provisions of this Exhibit, at Landlord's sole discretion, may be modified for any other tenant or free standing building that may be located in the Shopping Center.

10. All signs shall be reviewed by Landlord for conformance with these criteria and overall design quality. Approval or disapproval of signs based on aesthetics of design shall remain in the sole discretion of Landlord.

11. All signs must be installed with a 1" spacer keeping the sign off the store front.

12. Upon the expiration or earlier termination of the Lease, Tenant shall remove all signs at the Shopping Center relating to Tenant's business, including the immediate removal of all channel letters and the replacement of all panels in lighted box signs with new, white plexiglass panels, as applicable.

**CONFIGURATION:**

1. Sign shall be in the form of individual, full metal channel letters with colored translucent plastic face with trim caps, illuminated from the interior, mounted to chases or boxes, as provided by Landlord.

2. The overall length of the sign shall not exceed three feet in height (3 feet) and the sign must be centered vertically within the sign band, and shall also be centered on the sign bank between side leased lines. The sign area square footage shall not exceed 75% of the total length of the leased frontage.

3. Maximum sign height is 36 inches from top to bottom. Signs will be a minimum of 4 inches deep and a maximum of 6 inches deep.

**OPERATION:**

1. Tenant shall operate signs by means of a photoelectric cell which turns signs on at dusk and a time clock which will turn the signs off no earlier than 11:00 P.M.

## EXHIBIT "E"

## RULES AND REGULATIONS

**TENANT AGREES AS FOLLOWS:**

1. Tenant shall use its best efforts to complete all deliveries, loading, unloading and services to the premises prior to 10:00 a.m. of each day. Tenant shall attempt to prevent delivery trucks or other vehicles servicing the premises from parking or standing in front of, or at the rear of the premises from 10:00 A.M. to 9:00 P.M. of each day.

2. Tenant shall not, without the prior consent of Landlord, allow any vending, amusement or gaming machines on the premises, or use or permit any person to use the premises or any part thereof for conducting a second-hand store, auction, distress, fire, bankruptcy or going-out-of business sale, or for any use or purpose in violation of any federal, state, or local laws, ordinances, regulations and requirements and that during the term of this Lease the premises, and every part thereof, shall be kept by Tenant in a clean and sanitary condition, free from any objectionable noises, odors and nuisances. Any legal gaming, games of skill and keno which complies with state and federal law, and which was already previously consented to by the Landlord during the previous tenancy is not contemplated or otherwise implicated by this paragraph. Instead, the parties acknowledge that this paragraph applies to categories of items not previously consented to by the Landlord and which the Tenant wishes to implement going forward from the date of commencement. Such items require the consent of the Landlord.

3. All trash and rubbish of Tenant shall be deposited only within receptacles provided or approved by Landlord and no other trash receptacles shall remain outside of the building. Landlord agrees to cause such receptacles to be emptied and trash removed at Tenant's cost and expense.

4. Tenant agrees at all times to conduct its business in a dignified, ethical, responsible, and reputable manner consistent with the highest standards of service and merchandising; and to store or stock only such goods, and merchandise in the premises as Tenant intends to offer for sale at retail in the premises.

5. No radio or television antenna, aerial, satellite dish, or other similar device shall be installed without first obtaining in each instance Landlord's written consent.

6. Tenant shall not affix or maintain upon the glass panes and supports of the windows (and within 24 inches of any window), doors and the exterior walls of the premises, any signs, advertising placards, names, insignia, trademarks, descriptive material or any other such like item or items except as shall have first received the written approval of the Landlord as to size, type, color, location, copy, nature and display qualities. Anything to the contrary in this Lease notwithstanding, Tenant shall not affix any sign to the roof or exterior building walls of the premises.

   In addition, no advertising medium shall be utilized by Tenant which can be heard or experienced outside the premises, including without limitation, flashing lights, search lights, loudspeakers, radios or televisions. Tenant shall not display, paint, place or cause to be displayed, painted or placed, any handbills, bumper stickers, or other advertising devices on any vehicle parked in the parking area of the Shopping Center, whether belonging to Tenant, or to Tenant's agent, or to any other person; nor shall Tenant distribute, or cause to be distributed in the Shopping Center, any handbills, fliers or other advertising devices; nor shall Tenant disrupt, any patrons of the Shopping Center. In the event of a violation of this covenant by Tenant, Tenant shall pay to Landlord the cost and expense necessary to remove any such unauthorized material from the Shopping Center.

   Tenant may not display or sell merchandise or allow carts, portable signs, devices or any other objects to be stored or remain outside the defined exterior walls, roof and doorways of the premises, nor on the common areas.

7. Tenant shall keep the leased premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

8. The outside areas immediately adjoining the leased premises shall be kept clean and free from rubbish by Tenant to the satisfaction of Landlord, and Tenant shall not place or permit any obstruction or merchandise in such areas.

9. The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant or whose employees, agents or invitees shall have caused it.

10. Tenant shall use at Tenant's cost such pest extermination contractor as Landlord may direct and at such intervals as Landlord may require.

11. No overnight parking allowed.

12. Landlord may amend or add new rules and regulations not inconsistent with the terms of Tenant's lease.

[initials] ______ Landlord's Initials

______ Tenant's Initials

# EXHIBIT "F"

## PROHIBITED USES

In addition to the prior provisions of this Lease with regard to prohibited uses, Tenant agrees neither it nor its successors or approved assignees and sublessees will use any part of the Premises in any event for any other Exclusive Uses provided by Landlord in leases to other Tenants in the Shopping Center including but not limited to: (Not Applicable)

**EXHIBIT "G"**

**GUARANTY**

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to induce PTM, Inc.(7 Oaks Investment Corporation management) to enter into a certain Ten Year (10) Lease (the "Lease") with AM314, L.L.C. ("Tenant"), the undersigned hereby jointly and severally, absolutely, irrevocably and unconditionally guarantee to Company the full and complete payment and performance of all of the duties, obligations, liabilities, indemnifications and responsibilities of Tenant under the Lease (collectively, the "Obligations") and further covenants and agrees:

1. No act or thing need occur to establish the liability of the undersigned hereunder, and no act or thing, except full payment and discharge of all Obligations, shall in any way exonerate the undersigned or modify, reduce, limit or release the liability of the undersigned hereunder.

2. This is an absolute, unconditional and continuing guaranty of payment of the Obligations.

3. The undersigned will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to the undersigned against any person liable for payment of the Obligations, or as to any collateral security therefor, unless and until all of the Obligations shall have been fully paid and discharged.

4. The undersigned will pay or reimburse Landlord for all costs and expenses (including reasonable attorney fees and legal expenses) incurred by Landlord in connection with the protection, defense or enforcement of this guaranty in any litigation or bankruptcy or insolvency proceedings.

5. The liability of the undersigned shall not be affected or impaired by any of the following acts or things (which Landlord is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this guaranty, without notice to or the approval by the undersigned): (i) any acceptance, discharge, release or termination of collateral security, guarantors, accommodation parties or sureties for any or all Obligations; (ii) any one or more extensions or renewals of Obligations (whether or not for longer than the original period) or any modification of the contractual terms applicable to any Obligations; (iii) any waiver or indulgence granted to Tenant, any delay or lack of diligence in the enforcement of the Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Obligations; (iv) any full or partial release of, settlement with, or agreement not to sue, Tenant or any other guarantor or other person liable in respect of any Obligations; (v) any discharge of any Obligations or acceptance of any instrument in renewal thereof or substitution therefor; (vi) any failure to obtain collateral security (including rights of set off) for Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure or enforce any collateral security or modification, substitution, discharge, impairment, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Obligations or evidence thereof; (ix) any order of application of any payments or credits upon Obligations.

6. The undersigned waive any and all defenses, claims and discharges of Tenant, or any other obligor, pertaining to Obligations, except the defense of discharge by payment and performance in full. Without limiting the generality of the foregoing, the undersigned will not assert, plead or enforce against Landlord any defense, waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, usury, minority, illegality or unenforceability which may be available to Tenant or any other person liable in respect of any Obligations, or any setoff available against Landlord to Tenant or any such other person, whether or not on account of a related transaction.

7. The undersigned waive presentment, demand for payment, notice of dishonor or nonpayment and protest. Landlord shall not be required first to resort for payment of the Obligations to Tenant or other persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Obligations, before enforcing this guaranty.

8. If any payment applied by Landlord to Obligations is hereafter set aside, recovered, rescinded or required to be returned for any reason, (including without limitation, the bankruptcy, insolvency or reorganization of

Tenant or any other obligor), the Obligations to which such payment was applied shall for the purposes of this guaranty be deemed to have continued in existence, notwithstanding such application, and this guaranty shall be enforceable as to such Obligations as fully as if such application had never been made.

9. The liability of the undersigned under this guaranty is in addition to and shall be cumulative with all other liabilities of the undersigned to Landlord as guarantor or otherwise, without limitation as to amount.

10. This guaranty shall be enforceable against each person signing this guaranty, even if only one person signs and regardless of any failure of other persons to sign this guaranty. If there be more than one signer, all agreements and promises herein shall be construed to be, and are hereby declared to be, joint and several in each and every particular and shall be fully binding upon and enforceable against either, any, or all of the undersigned. This guaranty shall be effective upon delivery to Landlord, without further act, condition or acceptance by Landlord, shall be binding upon the undersigned and the heirs, representatives, successors and assigns of the undersigned and shall inure to the benefit of Landlord and its participants, successors and assigns. Any invalidity or unenforceability of any provision or application of this guaranty shall not affect other lawful provisions and applications hereof, and to this end the provisions of this guaranty are declared to be severable. This guaranty may not be waived, modified, amended, terminated, released, or otherwise changed, except by a writing signed by the undersigned and Landlord. This guaranty is issued in the State of Nebraska and shall be governed by its laws. The undersigned waive any notice of Landlord's acceptance thereof and waive the right to a trial by jury in any action based on or pertaining to this guaranty. Time is of the essence.

IN WITNESS WHEREOF, this guaranty has been duly executed by the undersigned.

______________________________________

Name: Matthew Longcor

Social Security No.: [redacted]

Date: 9-2-2022